Next case before us this morning is 24-6226 Thao v. Grady County Criminal Justice Authority. Good morning, Your Honors. May it please the Court. Jennifer Clark on behalf of the Special Administrator for the Estate of Justin Thao. I'd like to reserve three minutes of time for monitor the time. Thank you. We have detailed in our briefing the ordeal that Mr. Thao suffered at the Grady County Criminal Justice Facility on the one overnight that he was supposed to be spending there on his way to be closer to his family to serve out the remainder of his sentence. I would urge this Court to the extent you have not had the opportunity yet to view the videos that are in the record and the transcript that starts at 3-AP-241, they detail the gratuitous tasing of Mr. Thao despite the overwhelming use of force and restraint that was already in place. They detail Mr. Thao's placement in cell 126, an isolated shower cell, provision of a towel despite the existence of an interior door handle, and his repeated cries with increasing levels of distress over an hour and more than an hour and a half, asking for officers to come kill him, saying he would kill himself, and then ultimately his him being discovered having hung himself with the towel provided by the County. The District Court... Let me first clarify that with regard to the excessive force claim, you are only making it against the entity. That's correct. And it only refers to the tasing, not to any of the other force that was imposed. It refers to the tasing in particular, but of course the whether the tasing was excessive force must be considered in light of the overwhelming force that was that was already being applied against Mr. Thao at the moment that he was tased. As to your excessive force claim, is your claim based on a facially lawful use of force policy? It's based... We have two arguments. The first is that the policy itself, the County has admitted that its policy here was to tase an individual in these circumstances, which includes all of the circumstances. Well, I'm not sure they admitted that. You're talking about the admissions and the discovery? Yes. Okay, it seems to me they were admitting that if the facts are as they're saying, it was lawful. But the policy itself, I think, is facially lawful, isn't it? I think that the policy just based on the words as written on the paper would be lawful, but the County has interpreted that policy to include the circumstances that are here. And I think that's our initial claim, which is our view that the District Court erred in requiring an additional show of culpability, an additional showing of deliberate indifference. But even if your honors were to determine that there has to be an additional showing of deliberate indifference here, then we would argue that the policy as applied here, the risk of a deliberate indifference policy was obvious, and the County's endorsement of the officer's actions in this circumstance show the deliberate indifference. Did you plead? Is that a ratification theory? Did you plead that? Yes, I believe I can get the citation for you. That's okay, but you understand your own pleadings to have included a ratification theory. Yes. I wanted to ask you about your medical care claim. The appellee invites us to affirm the dismissal of that claim on the alternative ground that there was no constitutional violation. Why shouldn't we endorse that argument? Well, I think there's two reasons. First, that is not an argument that the District Court reached. They're contrary to my friend on the other side's position. We certainly can show individual violation just because there's also an entity violation here doesn't mean you can't show an individual violation. But also, there is no need to show an individual violation where you have the systemic failures that we have in this instance. We've detailed the multiple failings along throughout this entire ordeal, including policies on the use of cells 126, a shower cell for out-of-control prisoners without putting any additional safeguards into place to require more frequent checks for them. But your claim is a failure to train claim, isn't it? I think the failure to train is one component of the claim. There's definitely a failure to train claim in the case. The failure to train is also part and parcel of the systemic violations here. Sorry, one second. So for a failure to train claim, can you rely on a systemic theory for a failure to train claim specifically? I think you can rely on a system. There's both a failure to train and a systemic failure. And I don't think you can disregard the failure to train when that is part of one of the things that has failed in the system. That doesn't answer my question. Let's talk just doctrinally. For a failure to train claim, do you need to establish an individual constitutional violation? In other words, you cannot rely for your constitutional violation predicate on a failure to train theory on a systemic violation, correct? I think if you're only relying on only a failure to train, then this court's case law says you have to have an underlying individual violation. If there is also a systemic failure, then I think you do not have to have that showing. I don't think that in either instance, I think that this court should reverse the grant of summary judgment. I'm not understanding how we approach your claim if it's understood as a systemic claim. What are you alleging to be the municipal violation here if it's not a failure to train? Because you can't rely on systemic liability for a failure to train claim. I think that there is a systemic failure of multiple policies in place here that led to Mr. Tao's death. We've detailed those in the brief, but one of the things that's at issue here for sure is the failure to train on suicide risk. You can't merge them. If it's a failure to train claim, you have to have an individual who has committed a constitutional violation. So put that in one column. If you're making a systemic claim, then you've got to point to some custom or policy or something that the entity itself did that resulted in a constitutional violation of some kind. Would you agree with that? Yes, Your Honor. What's the constitutional violation that you're pointing to under your systemic claim? So I think it is the violation of the failure to provide adequate medical care to Mr. Tao. And it comes from the combination of multiple policies and failings, exactly the kind of systemic failure that this court has looked at that existed throughout this ordeal. And we've detailed some of them, a number of them in the briefing. But it includes the use of cell 126 as an isolation cell. It includes the reliance on a stale medical evaluation form without actually doing an evaluation for suicide risk upon entry into the jail. It includes the leaving him in the cell without responding to him. What do we do with the fact that both of the officers who were on duty that night testified that they understood that if a person is suicidal, that they should call the nurse, and they understood if a person is threatening to kill themselves or saying, just kill me, that that's enough that you should call the nurse? So I think it's only one of the officers that testified to the just kill me language. But the failure to train in detecting suicide risk would have made a difference in this case at many points in the case prior before the... What it sounds to me like they're saying is that we understood, or at least you're saying one of them, we understood the policy was if somebody is either threatening to kill themselves or saying, I want you to kill me, that that's enough to trigger us to have to call in a nurse to have them evaluated. It sounds to me like they didn't comply with the policy, which would make it so that there's no entity liability here. Help me out here. How am I confused? So I think there is a benefit to training that was absent here, which is the training to raise... They're saying, I am trained. I do know. I was supposed to call the nurse when he repeatedly said kill me and threatened to kill himself. But for reasons we don't know, they didn't call the nurse. That may be an individual deliberate indifference claim, but it seems to me that it is fatal to your Monell claim. So two of the officers have some testimony that they did know once someone was identified as suicidal or said they were going to kill themselves that they should call the nurse. One of those officers, though, also testified, answered the question, no, when asked whether he was trained on detecting risk of suicide, identifying risk of suicide. And there were many points along the line here where training on identifying risk of suicide would have resulted in a different outcome for Mr. Tao. It would have also sensitized officers on taking these statements seriously, listening to them and understanding when a prisoner is calling out the number of times. You don't just ignore that. You actually take it seriously. And making that difficult determination is something that training would have helped to clarify for the officers and would have resulted in a different. And there are also other officers who were interacting besides these two who were interacting with Mr. Tao. And I would point out that Grady County here does not deny that they provided no training whatsoever on detecting suicide risk among the turnaround inmate population in particular. That inmate population is a population in which the guards do not have familiarity. They don't have a baseline against which to judge. Your complaint didn't mention turnaround specifically, did it? You focused on these sort of, you focused on inmates who are coming through the facility. But I don't recall seeing specific argument or allegation with respect to the turnaround population. In the summary judgment briefing below, there definitely was discussion of the turnaround inmate population. We have expert testimony that focused on the turnaround inmate population. And in addition, the county does not deny or actually completely concedes that it provided no special training whatsoever on supervising cell 126 when it's being used as an isolation cell for inmates in some form of crisis and in detecting suicide risk among inmates in those cells. And this court should reverse the grant of summary judgment to the county on those bases alone. As to the broader inmate population, there is genuine dispute of material fact whether officers were adequately trained. There's two snippets of testimony from two officers, but there is also evidence in the record that the only policies on which officers were trained was on what to do once someone was identified as suicidal, not on how to detect that risk. So if we agree with you that there is a dispute of fact on whether the officers or the county provided training on how to detect suicide risk, not just on what to do once someone is identified, what's the outcome for you? Do we send it back? Yes. So you would reverse the grant of summary judgment that was granted to the county because the district court drew inferences in favor of the county and there's disputed issues of material fact that should go to a jury. How should we be interpreting the state policies? Are those policies focused only on what you do once someone is identified or do they focus on identifying? They are only about what to do once someone is identified and you can read them in the record. If there are no further questions, I'd like to reserve the last minute for rebuttal. Thank you. Thank you, Your Honors. Andy Artis for the Jail. I'd like to just remind the Court that a municipality's culpability for the deprivation of rights is at its most tenuous where a claim turns on a failure to train. Thank you. The background on Mr. Tao I think is in the briefs, but he was being transported to be closer to his family. He had one year left on his sentence. He had been evaluated three days prior to being sent to the jail and found to be not suicidal or have any kind of medical conditions. I'm going to interrupt you if you don't mind. I think we're familiar with the facts, but you started your argument by focusing on the failure to train theory. Do you agree with the appellant that there are two distinct types of municipal liability claims, one predicated on a failure to train which requires the showing of individual constitutional violation and one that's a systemic theory? I don't remember them pleading the systemic, but maybe they did, but I still think in a systemic you would need to show an underlying violation. With regard to the suicide policy and training, the policy was that anyone making a threat of self-harm is required to be pulled for suicide watch and further evaluation. When you're on suicide watch, the policy was you're put into a two-man cell and you're stripped of your clothes and bedding and towels and put on a suicide smock and checked every 15 minutes. The policy did not cause this constitutional violation. The jail was not on notice to a moral certainty or with deliberate indifference that this policy or their training on it was insufficient. So you refer in your briefing to the estate says there's a dispute effect on whether the county trained its officers on how to identify inmates at risk of suicide, and you seem to acknowledge that there is some dispute in the evidence and you call it a semantic quibble. And what concerns me is that we have testimony that in response to a question about whether there was such training to identify inmates at risk of suicide, Officer Duncan literally answered no. And I'm not sure what we're supposed to do with that in finding that you prevail here. Well, Mr. Duncan, in volume two, page 50, also, so it is a quibble because they were asking him kind of a textbook kind of a thing, but when he got down to the weeds, he admitted, he said some of the things that he was trained on was to look for changes in appetite, changes in appearance, changes in behavior. He says that he got trained on signs of what to look for, and that was volume two, page 50. Volume two, page 47, he said if an inmate, and this is Duncan, said if an inmate said he was going to kill himself, he was trained to bring them to the medical for evaluation. He said he had done that more than five times, so he had a lot of experience doing that. John Farley, he said he was trained that if any threat, any kind of threat of harm to oneself or another, that needs to be dealt with. He said if he heard I want to die or I just want to die, he would have them taken down to the nurse. Trevor Hinneman said if Tao made a statement he was considering harming himself, he would have gone to medical. That is something the jail did not take lightly. That's what he said. They went straight to medical, did a medical evaluation, and put on suicide watch. What about training specifically as to cell 126? Do you agree with the appellant's argument this morning that your client agrees that there was no specific training on cell 126? No, there is training on cell 126. The policy is not to put suicidal inmates in cell 126. Charging a guard and a nurse does not mean there's a suicidal risk. It means you're a violent and aggressive and an escape risk. What's an inmate is placed in cell 126 and is saying the sorts of things that Mr. Tao said, is there training on what you do to remove that person perhaps from the cell? Yes, as I just mentioned, the training was when they make statements of self-harm, then you immediately remove them. You put them on suicide watch until they get an evaluation for them. If those jailers, I mean, when you listen to the video, it's very hard to hear what's going on. All you can hear is arguing and a lot of noise. You don't know what they're saying. But if those... But there's parts where the officer responds and says something like nobody's going to kill you. So he must have heard the statements that you're going to kill me. Right, and I think in that part, it sounds to me at that point when he's talking to him, he's saying, hey, there's nothing to worry about. Just chill out. I'm paraphrasing, but just chill out. You're going to go. All you've got to do is be good for a little while. And he says, okay, sorry. That's what he says. So there's no indication of that. Right, but if you look at what they testified in their depositions was once somebody starts saying either I want to die or kill me or I'm going to kill myself, they were supposed to call the nurse. Well, if they... Would you agree that's what they said? No, I don't. I've got it right on my screen. The transcript, right? Of their depositions, yeah. Oh, okay. Well, then I don't disagree if it's in their transcript. But I guess what I'm trying to get at is if they heard or recognized and made the connection in their head that this guy is self-harming and then they didn't do anything about it, then that would be a violation of our policy. And the policy is a good policy, and it didn't cause the constitutional violation here. And that's why there's not... That's why the court granted our summary judgment. What about this argument that they weren't trained how to recognize somebody in a mental health crisis, how to identify it? Did that lead to the injury here? I don't think so, because the training is if they make self-harm statements, and all the allegations here are that he was saying stuff that could be interpreted as being self-harm or something like that. So it's pretty clear if you hear somebody saying, I'm going to kill myself or I'm going to harm myself or you harm me or anything like that, you put them in the suicide watch and the jailers testified they understood that. And so the training was adequate for what they needed to do. And plus, we don't have any patterns of this being a problem in the jail. We don't have other suicides. We don't have other problems where they were misidentified or anything like that. So it's your position that what happened in cell 127, even though it's the same kind of cell because it wasn't a suicide, is not relevant? Well, I think cell 126... I think 127 was... Yeah, but the prior death was in 2015. It was an overdose. It was in 127. It wasn't in 126. It was not a suicide. It was not... Nobody was written up for a failure to recognize signs of suicide. And as we cited in our brief, one prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations. And that's Waller. But in that, the incident in 127, they were written up because they weren't actually checking on the prisoner as frequently as they should have been. And the policy is they have... I'm sorry. Am I remembering that correctly? The policy is they're supposed to check every hour. And in this case, they were 14 minutes over and they violated the policy on that. The policy is you're supposed to go 14 every hour and they went 14 over. They went over. But that is a violation of the policy. The policy is good. It didn't cause the violation. Well, and if they had acted on the statements that they heard and recognized that, or I guess they say they did recognize that as evidence of suicide ideation, then they would have had to check on him every 15 minutes. They would have had to pull him out of 126 and put him into a two-man cell where they have video surveillance and where they check and they log every 15 minutes that he's looked at. Not only that, all of his clothes would have to be taken off. He would not have had a towel. He would have had these smocks to help prevent hanging. And they would have put him in a cell where you can't hang yourself. Here, he played in the building. I don't recall what the record is exactly. Maybe you can help me. Was he given a towel after he said, kill me? No. No, this is right when he was put in the floor and he asked for it because there's water on the floor. Because as you know, it was also used as a shower. So the towel was when he was put into the cell? Yeah, right at the very beginning. One of the things I just want to point out to the court is, you know, the 14 minutes over, failure to adhere to administrative regulations does not equate to a constitutional violation. I think probably one of my, the case I cite is Bain v. Iron County. The argument about the door handle, which we really didn't talk about, these are, Bain said, talks about these are torts of negligent design, a state remedy, not a constitutional violation. And the complaint about no camera in the cell, also in Bain, the failure to have a camera in a cell does not constitute a constitutional violation. And again, he wouldn't have been put in here if he was suicidal or if they had known he was suicidal at the beginning. And if the jailers failed to heard that he was saying things that were self-harm, and then they made that connection and they failed to do anything about it, and they were deliberately indifferent in not doing that, I mean, that would be clearly a violation for policy. So with that, I think I'm finished. Yeah, it's just two, three quick points. On 126, the county has conceded that there was no training specific to cell 126. The opposition, their opposition braved the 26 to 38. I don't understand why that's relevant if he, they, if they would not have put a known suicidal inmate in 126. Many of the statements that Mr. Talmadge made were after he was placed into 126, and precisely that is why training is needed in order to determine whether to keep someone in there, whether to take the towel away once you've given it to him. Yes, they gave it to him at the beginning, but they left it in there with him. It was given to him to dry the wet shower floor. They could have taken it away. They didn't. And I would also just point out that cell both lacks a camera and has the covered window opening. I would say on, they're focusing on the policies, but this is, the policies don't have meaning unless there's adequate training on them. And here there is multiple disputes of fact on whether there was actually training on detecting the risk of suicide. There were multiple officers who interacted with Mr. Tao at multiple contact points throughout this long ordeal. At any number of points, those, any one of those people could have avoided this horrible tragedy, and if they'd had enough training, they would have been able to do so. And the one or two snippets where one or two officers said they would have referred to the nurse does not resolve disputes of practice to whether training was adequately provided to the officers at this facility. I have, may I ask? Sure. If we're understanding, let's say we're just focusing on the failure to train cell 126, and that's the thesis for Manal Liabilities, failure to train. So you need an individual, a constitutional violation by an individual. In order for you to prevail, you need to have that. Why is there a jury question on that, on an individual constitutional violation here, and who should we be looking at specifically? Well, I think that there are, there are multiple officers who interacted with Mr. Tao over the course of the, of the incident. The, the, the testimony that some of, that they, that they didn't hear Mr. Tao or didn't understand Mr. Tao is simply not credible. You can look at the record, look at, look at the transcript in the video to see that. If they, if they heard it and didn't do anything, I think that's circumstantial evidence of their subjective knowledge. So I think there are multiple officers, and there's, there is a, there's dispute of fact on whether there's an individual underlying violation here. The district court did not reach that issue. This court could reverse the summary judgment and return this to the district court to reach that issue in the first instance. But I also do think that there is, this is, given the, the, the way all of these different policies came together and all of the different officers that interacted with him over the course of this period, this does also seem to be a systemic failure of the system, and there, no individual violation would be required. Thank you. Thank you. We'll take this matter under advisement, and thank you both for your argument.